AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

United States of America

v.

Victor Anthony Olivera Hernandez,

Defendant(s)

Case No.  2:22-mj-03646-DUTY

FILED
CLERK, U.S. DISTRICT COURT
9/13/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: /s/ Valencia Munro  DEPUTY



LODGED
CLERK, U.S. DISTRICT COURT
9/13/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____CD_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 4, 2022 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession With Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Roger Chaney, Jr.
Complainant's signature

Roger Chaney, Jr., Special Agent, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 13, 2022

Judge's signature

City and state: Los Angeles, California    Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

AUSA:   Jenna W. Long (213-894-8692)

**AFFIDAVIT**

I, Roger Chaney, Jr., being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Victor Anthony Olivera Hernandez ("HERNANDEZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices, in the custody of the United States Drug Enforcement Administration (the "DEA"), in Camarillo, California, as described more fully in Attachment A-1:

   a. A red iPhone with identifying item number N1 related to DEA case file number RS-22-0012 ("SUBJECT DEVICE 1"); and

   b. A red iPhone with identifying item number N2 related to DEA case file number RS-22-0012 ("SUBJECT DEVICE 2").

3. This affidavit is also made in support of an application for a warrant to search a black iPhone with identifying item number 10 related to Santa Barbara County Sheriff report number 22-9071 ("SUBJECT DEVICE 3" and, together with SUBJECT DEVICES 1 and 2, the "SUBJECT DEVICES") in the custody of Santa Barbara County Sheriff's Office, in Santa Maria, California, as described more fully in Attachment A-2.

4. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6. I am presently employed by the DEA, Los Angeles Field Division, as a special agent and have been so employed since October 2020. I am currently assigned to the Ventura Resident Office. Before becoming a DEA special agent, I was a Peace Officer Standards and Training ("POST") certified police officer in the State of Georgia for approximately eight years. During my time as a police officer, I worked for the patrol division as a patrol officer and as a supervisor holding the ranks of

Sergeant and Lieutenant.  I have attended and completed several law enforcement training courses and have obtained advanced officer trainings, including, but not limited to, the Georgia Peace Officer Standards and Training Basic Law Enforcement training and have received several hours of additional training and DEA Basic Agent training.  I graduated from Fort Valley State University with a Bachelor of Arts degree in Criminal Justice.  As a DEA special agent, I investigate a variety of federal drug crimes including, but not limited to, violations of 21 U.S.C. §§ 841, 843(B), 846, and 848.  During my investigations, I have assisted with the seizure of drugs and arrested individuals, I have become familiar with the methods and practices used by drug traffickers to distribute and store drugs.  I have conducted electronic and visual surveillance, questioned witnesses, executed search and arrest warrants, and worked with confidential sources and undercover agents.

### III.  SUMMARY OF PROBABLE CAUSE

7.  On August 4, 2022, HERNANDEZ possessed approximately over 16,000 pills containing fentanyl (including wrappings and/or containers) and a variety of other controlled substances and a digital scale in his bedroom and in the backyard of his house.  HERNANDEZ told officers the drugs belonged to him and that he was holding them for another individual.  HERNANDEZ's girlfriend's phone (SUBJECT DEVICE 2) contains messages from HERNANDEZ with coded terminology referring to HERNANDEZ selling narcotics.  SUBJECT DEVICE 1 was found in the car where HERNANDEZ had been sitting before his arrest and was identified

3

by his girlfriend as his phone. SUBJECT DEVICE 3 was found in HERNANDEZ's bedroom which also had several controlled substances.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Initial Investigation of HERNANDEZ**

9. In early July 2022, the Santa Barbara County Sheriff's Office was told by the San Luis Obispo County Sheriff's Office of a possible drug dealer using the cellular phone number 805-219-9515 (the "9515 Number"). Specifically, according to San Luis Obispo County Sheriff's reports, after arresting an individual on controlled substance offenses, San Luis Obispo County Sheriff's Officers searched that individual's phone pursuant to electronic probation search conditions. On this phone, officers saw messages which they understood to be consistent with the 9515 Number supplying this individual with cocaine. They obtained a warrant authorizing them to obtain GPS location data for the 9515 Number. The GPS location data for the 9515 Number showed that the phone was often in Santa Barbara County, including in the vicinity of 123 N. Curryer Street, Santa Maria, California (the "Curryer Street house"). The 9515 Number would frequently be in the proximity of that address at night, consistent with someone sleeping there.

10. As part of their investigation, on July 7, 2022 and later dates, Santa Barbara County Sheriff's officers went to the

4

Curryer Street house to conduct surveillance.  According to reports, at least as early as July 7, 2022, the officers observed a man, later identified as HERNANDEZ, leave the residence.  According to criminal history records, HERNANDEZ was at that time on probation for possessing a loaded firearm while under the influence of methamphetamine in a case where had initially been charged with possession with intent to sell controlled substances.

      11.  According to Santa Barbara County Sheriff's reports, on two occasions, in mid-to-late July 2022, Santa Barbara County Sheriff's officers saw HERNANDEZ conduct what appeared to be hand-to-hand transactions consistent with drug distribution.  Specifically, on one occasion officers saw HERNANDEZ leave the Curryer Street house, get into a red Mercedes with license plate ending -982 (the "red Mercedes"), and drive to a nearby mall, where HERNANDEZ parked by a truck.  An unknown female got out of the truck, walked to the red Mercedes, leaned into the window of the red Mercedes for a few seconds, then returned to her truck and left.  HERNANDEZ then immediately walked to an ATM.  On another occasion, approximately a week later, HERNANDEZ again left the Curryer Street house and drove away in the red Mercedes to a nearby market.  HERNANDEZ parked, then drove around the block, and then ultimately re-parked nearby on the street.  To the observing officers, HERNANDEZ appeared to be looking for someone.  Then an unknown male on his skateboard, that officers had seen on his phone, rode up to the red Mercedes and leaned in the window of the red Mercedes.  Less than a minute later, the

5

male skateboarder rode away.  When HERNANDEZ left, the officers believed him to be engaging in counter-surveillance driving tactics, including making random stops and unnecessary turns. Based on the officer's descriptions, as well as my training and experience, these interactions are consistent with HERNANDEZ conducting a hand-to-hand transaction, exchanging drugs for money.

12. Based on records I have reviewed from the California Department of Motor Vehicles, the red Mercedes is registered to HERNANDEZ.

13. On August 2, 2022, a Judge of the Superior Court of the State of California, County of Santa Barbara, authorized a search warrant of the Curryer Street house, the Red Mercedes, and the person of HERNANDEZ.

**B.   Stop and Search of HERNANDEZ's Car**

14. On August 4, 2022, Santa Barbara County Sheriff's officers arrived at the Curryer Street house to prepare to execute the state search warrant.

15. At approximately 9:20 a.m., officers saw HERNANDEZ leave the home and get into the passenger seat of the red Mercedes while a female individual, later identified to be Lania Day ("DAY"), HERNANDEZ's girlfriend, got into the driver's seat of the red Mercedes and they drove away.  After approximately one block, the red Mercedes turned around and returned to the Curryer Street house.

16. Before HERNANDEZ and DAY exited the vehicle, a Santa Barbara County Sheriff's officer turned on the red and blue

lights of his unmarked patrol car and pulled over the red Mercedes.  Pursuant to the search warrant, the officer searched HERNANDEZ and the red Mercedes.

17.   In HERNANDEZ's pants' pocket, the officer found two clear plastic bags, each containing approximately 10 blue "M30" pills of suspected fentanyl.  Based on my training and experience, blue "M30" pills are often counterfeit Oxycodone pills that contain fentanyl.

18.   Inside the red Mercedes the officers found two red iPhones (SUBJECT DEVICES 1 and 2).  SUBJECT DEVICE 1 was found on the passenger seat, where HERNANDEZ had been seated when the officers stopped the car.  SUBJECT DEVICE 2 was found in the driver's side door pocket near where DAY had been seated when the officers stopped the car.  SUBJECT DEVICE 2 had a picture of DAY as the phone's background.

     **C.**    **Search of the Curryer Street house**

19.   Santa Barbara County Sherriff's officers searched the Curryer Street house.  Inside the house at the time of the search there was a female individual, later identified to be HERNANDEZ's mother, and two minor children.  According to Santa Barbara County Sheriff's reports and my conversations with officers involved in the search, officers found the following during the search:

20.   In the southwest bedroom, which HERNANDEZ's mother identified as where HERNANDEZ stays, the officers found suspected controlled substances.  Specifically, the officers found a grey grocery-type bag containing eight plastic bags,

7

each with approximately 1,000 blue "M30" pills containing suspected fentanyl, near the foot of the bed.  Also near the foot of the bed, officers found approximately 27 grams (including packaging) of suspected 3,4-methylenedioxymethamphetamine ("MDMA").  Inside a hutch in the bedroom, officers found approximately 3 grams (including packaging) of suspected cocaine; sheets of blotter paper, with hundreds of individual tear off sheets, consistent with use with acid; and a single round of ammunition.

    21.  Behind the bedroom door and near the foot of the bed the officers found suspected marijuana.

    22.  Officers conducted a field test of the suspected MDMA, cocaine, and acid blotter paper.  The suspected MDMA and cocaine both tested presumptively positive for MDMA and cocaine respectively.  The field test on the suspected acid blotter paper was inconclusive.

    23.  Inside the hutch that contained some of the suspected controlled substances, officers found a medical marijuana card with HERNANDEZ's name and HERANDEZ's picture on it.

    24.  The officers also found a digital scale, which appeared to have drug residue on it on an end table in this bedroom.

    25.  Also in this bedroom, on a desk, which appeared to be used as a nightstand, officers found SUBJECT DEVICE 3.

    26.  No other suspected controlled substances were found inside the Curryer Street house.  Outside, in the backyard, near s shed officers found another grey grocery-type bag containing

eight plastic baggies containing approximately 1,000 blue "M30" pills each, containing suspected fentanyl. Near the "M30" pills officers found 218 grams of suspected psilocybin mushrooms, as well as a large amount of suspected marijuana in a makeshift doghouse in the backyard.

27. Based on my training and experience, a digital scale, the presence of several types of controlled substance, some in significant amounts, and specifically, this large of a quantity of suspected fentanyl pills, is consistent with distributing controlled substances.

**D.   DAY's Statements and Review of Her Phone**

28. Detective Furber conducted a recorded interview of DAY. Based on my review of that recording, DAY identified SUBJECT DEVICE 2 as her cellphone. She also identified SUBJECT DEVICE 1 as a phone she purchased for HERNANDEZ, which he used. DAY consented to a search of SUBJECT DEVICE 2. During a search of the text messages contained on SUBJECT DEVICE 2, Detective Furber reviewed a conversation with the 9515 Number. DAY said this conversation was with HERNANDEZ. This conversation showed that DAY received a message from the 9515 Number which stated, "doing 2 sacks then omww." Based on my training and experience, I recognize this to be coded terminology that means HERNANDEZ was doing two drug deals and then would be on his way.

29. Detective Furber obtained a California State Court authorized search warrant to search the SUBJECT DEVICES. The Santa Barbara County Sherriff's Office was unable to unlock SUBJECT DEVICE 1 or extract any data. The Santa Barbara County

9

Sherriff's Office was able to extract data from SUBJECT DEVICE 2, and I have not reviewed or obtained the forensic extraction. Based on my training and experience, investigators conducting a forensic extraction of a device would not corrupt, alter, or erase the data on a device.  As a result, I believe the data contained on SUBJECT DEVICE 2 is still in the same form as when the device was seized.

30.  On August 31, 2022, I took SUBJECT DEVICES 1 and 2 into my custody and transported them to the DEA in Camarillo, California, where they remain.  SUBJECT DEVICE 1 has been assigned item identifying number N1 related to DEA case file number RS-22-0012.  SUBJECT DEVICE 2 has been assigned item identifying number N2 related to DEA case file number RS-22-0012.

    **E.**    **HERNANDEZ's Statements**

31.  While seated in the back seat of a police car, handcuffed, HERANDEZ was advised of his <u>Miranda</u> rights by an officer.  HERNANDEZ acknowledged that he understood his rights and agreed to answer questions.  In sum and substance, based on my review of a recording of HERNANDEZ's interview, among other things, HERNANDEZ told officers the southwest bedroom was his, that all of the drugs in the house and backyard were his, and that DAY had nothing to do with them.  HERNANDEZ denied selling the drugs, claimed he only sells marijuana, and said he was holding the other drugs for an unnamed individual.

32. HERNANDEZ refused to consent to a search of SUBJECT DEVICE 1 and refused to provide the password. HERNANDEZ claimed that phone belonged to his cousin.

### F. DEA Laboratory Testing of Suspected Controlled Substances

33. I took the suspected fentanyl, acid blotter paper, and the psilocybin mushrooms into DEA custody. They were transported to the DEA Southwest Laboratory. The Laboratory has not completed testing on all of the suspected controlled substances. So far, according to chemists employed by the DEA Southwest laboratory, all nine bags that have been tested so far--consisting of 5,804 pills of the suspected fentanyl found in the Curryer Street house--have tested positive for fentanyl with a net weight of over approximately 938.8 grams. Based on my training and experience, this amount of pills containing fentanyl is inconsistent with personal use; rather it is consistent with the amount that someone would possess in order to distribute it to others. The laboratory is still testing the remaining fentanyl and other drugs.

34. The suspected MDMA, cocaine, and one pill of suspected fentanyl were transported to the Bureau of Forensic Services Santa Barbara Regional Laboratory in Goleta, California.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

35. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

   e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices and communicate with others in their proximity about drug sales.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

 36. As used herein, the term "digital device" includes the SUBJECT DEVICES.

 37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

13

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

14

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To

15

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

        c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    40. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

16

## VII. CONCLUSION

41. For all of the reasons described above, there is probable cause to believe that HERNANDEZ has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13th day of
September, 2022.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE